**CENTRAL FLORIDA SHEET METAL CONTRACTORS ASSOCIATION, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

No. 79–2396.

United States Court of Appeals, Fifth Circuit.*
Unit B

Dec. 21, 1981.

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Gerard C. Smetana, Chicago, Ill., for petitioner.

Elliott Moore, Deputy Assoc. Gen. Counsel, Richard B. Bader and Marion Griffin, Attys., NLRB, Washington, D. C., for respondent.

Donald W. Fisher, Toledo, Ohio, Mark F. Kelly, Richard H. Frank, Tampa, Fla., for Intervenors.

Before GODBOLD, Chief Judge, TUTTLE and HILL, Circuit Judges.

GODBOLD, Chief Judge:

This is another labor dispute concerning union efforts to secure collective bargaining contracts in the sheet metal industry that provide for employer contributions to a trust fund for the benefit of employees. It is decided together with *Mobile Mechanical Contractors Association, Inc. v. Carlough* 664 F.2d 481 (5th Cir. 1981). We review a decision by the National Labor Relations Board that a union did not commit an unfair labor practice by striking to obtain the trust fund.

Petitioner, Central Florida Sheet Metal Contractors Association, Inc., is a nonprofit Florida corporation that conducts multi-employer collective bargaining on behalf of its employer members. The first contract negotiated by the association with Local 493 of the Sheet Metal Workers International Association expired by its terms July 31, 1974. In early July the association and the local commenced negotiations for a new contract. At the urging of intervenor Sheet Metal Workers International Association ["the international"] and Edward J. Carlough, president of the international, the local insisted upon inclusion in the contract of the National Stabilization Agreement for the Sheet Metal Industry, which provided for a trust fund for the benefit of employees funded by employer contributions.

The association resisted the local's demand, and the local struck. After a month the association surrendered and agreed to a contract containing the trust fund. The union membership ratified the proposed contract and returned to work. The association and the local formally executed a three-year agreement incorporating the trust fund retroactively to August 1, 1974, the date of the strike. Thereafter the association filed unfair labor practice charges that form the basis for this case, alleging that the local, the international and Carlough violated §§ 8(b)(1)(B) and 8(b)(3) of the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 158(b)(1)(B) and 158(b)(3), by insisting to impasse on incorporation of the trust fund into the contract.[1]

The trust fund was established by the international in 1973 to provide supplemental economic assistance to "under-employed" union members. The Board found that the international's intention was "to achieve a rough approximation in disposable income and fringe benefits between union members who were fully employed and those who were unemployed, due to local economic conditions, for a substantial portion of the year." The trust fund was to be funded by contributions at 3% of total payroll wages from all sheet metal contractors who agreed to incorporate it into their collective bargaining agreements. The Sheet Metal Contractors Association of San Francisco was the first employer association to include the trust fund in a collective bargaining agreement, and, accordingly, it se-

---

1. The association also charged, and the Administrative Law Judge found, that the local, the international and Carlough violated §§ 8(b)(1)(B) and 8(b)(3) by insisting to impasse on incorporation of Article X, § 8 of the international's Standard Form Union Agreement, which provides that in the event the association and the local are unable to reach agreement on the terms of any future contract such terms will be submitted to arbitration by the National Joint Adjustment Board. This board is comprised of representatives of the international and the National Sheet Metal and Air Conditioning Contractors Association, to which the Central Florida association and its employer-members do not belong. This finding is not challenged.

lected the first employer trustee. The portions of the trust fund agreement relevant to this proceeding are set forth in the margin.[2]

The Administrative Law Judge found that the provisions of the trust fund agreement precluded the association from "equal" representation in the administration of the fund, and the trust fund therefore violated § 302 of the Labor Management Relations Act ["LMRA"], 29 U.S.C. § 186.[3] The ALJ looked at other cases in

**2.** Section 1. UNION AND EMPLOYER TRUSTEES. The operation and administration of the fund shall be the joint responsibility of one Trustee appointed by the Employers and one Trustee appointed by the International Union. The number of Trustees may be changed from time to time but there shall always be an equal number of Employer and Union Trustees.
. . . .
Section 4. TERM OF TRUSTEES. Each Trustee above named, and each successor Trustee shall continue to serve as such until his death, incapacity, resignation, or removal as herein provided. Employer Trustees may be removed and replaced at will by a majority of the then Employer Trustees and Union Trustees may be removed and replaced at will by the General President of the International Union.
. . . .
Section 6. DESIGNATION OF EMPLOYER TRUSTEES BY EMPLOYER PARTIES. Any Employer who is or may become a party to this Agreement and Declaration of Trust agrees irrevocably to designate as its representative in the operation and administration of the Fund such Trustees as are named in said Agreement and Designation of Trust as Employer Trustees, together with their successors selected in the manner provided herein, and agrees to be bound by all the actions taken by the said Employer Trustees pursuant to this Agreement and Declaration of Trust.

**3.** Section 302, 29 U.S.C. § 186, provides in relevant part:
(a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—
(1) to any representative of any of his employees who are employed in an industry affecting commerce; or
(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce; or
(3) to any employee or group or committee of employees of such employer employed in an industry affecting commerce in excess of their normal compensation for the purpose of causing such employee or group or committee directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing; or
(4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him with respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.
(b)(1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section.
. . . .
(c) The provisions of this section shall not be applicable . . . (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): *Provided*, that (A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon . . .; and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities, . . . .
(d) Any person who willfully violates any of the provisions of this section shall, upon conviction thereof, be guilty of a misdemeanor and be subject to a fine of not more than $10,000 or to imprisonment for not more than one year, or both.
(e) The district courts of the United States and the United States courts of the Territories

which the Board had considered conduct that violated statutes other than the NLRA in finding an unfair labor practice[4] and reasoned that "[i]f it is right for the Board to consider violations of laws other than this entire statute, and in part predicate unfair labor practice findings upon such misconduct surely it may, and ought, take like heed of violations of related provisions of the very statute it is charged with enforcing." The ALJ concluded that by bargaining to impasse for a trust fund that violated § 302 of the LMRA, the international and the local had committed an unfair labor practice in violation of § 8(b)(3) of the NLRA.[5] The ALJ recommended that the Board order the international and local to delete the provisions for the trust fund from the 1974 contract or at the option of the association to void the entire agreement and renew the collective bargaining process; to refund any contributions made by members of the association to the trust fund; and to cease and desist from demanding the trust fund.

The Board did not adopt the ALJ's findings of fact and conclusions of law on the grounds that it lacked jurisdiction to interpret § 302 and that Congress had granted the federal district courts exclusive jurisdiction to determine the structural validity of trust funds under § 302. As a general rule, the Board posited, it does not enforce other statutes except at the express direction of the Supreme Court as in *Scofield v. NLRB*, 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969), where the Court held that the Board must assess union rules to determine if they frustrate the overriding policy of all federal labor law, not just the NLRA.[6] The Board pointed out that when considering other statutes at the Court's direction it only evaluates facial compliance with the statutes. In contrast the Board said neither the Court nor Congress had directed the Board to enforce § 302, which in the present case would require interpretation of complex multiemployer trust agreements.

The Board distinguished an earlier decision, *John F. Boyle Co.*, 222 NLRB 1309

and possessions shall have jurisdiction, for cause shown, and subject to the provisions of section 381 of Title 28 (relating to notice to opposite party) to restrain violations of this section, without regard to the provisions of [the Norris-LaGuardia Act].
The ALJ stated:
No employer except employers who participated in the initial establishment of SASMI may participate in the selection of any employer trustees; by contrast, the International Association retains such a right to remove and select union trustees from time to time. There is an inequality of representation in that the General President of the International may remove and replace the union's trustees at will, whereas the employers have no comparable right. Thus, the removal and replacement of employer trustees may be had only by a majority vote of the preselected "employer trustees" and not by any action whatsoever of the employers themselves. Thus, there is basis for concluding the increase in the number of trustees can be so manipulated by the union president as to control the majority of trustees. All the International President need do is refuse to agree to an increase in the number of employer trustees unless he approves the person advanced by the "employer trustee."
Section 6 of [SASMI] concerning the selection of trustees to the Fund on the part of employers makes a mockery of the idea that the Florida employers could have the least voice in any selection of who should represent

them as employers. For them to be bound "irrevocably to designate" the trustee already named in the original Trust Agreement back in 1973 means McKenzie, the man put on the trustee board in California, forever pre-empts the entire matter. The reality is that they never had any choice and it was intended that they should never have any choice.

4. *Alleluia Cushion Co.*, 221 NLRB 999 (1975) (Occupational Safety and Health Act); *Carpenters Local Union No. 22*, 195 NLRB 1 (1972) (Labor Management Reporting and Disclosure Act). *See also Southern Steamship Co. v. NLRB*, 316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1246 (1942) (Board must consider policy of mutiny laws in formulating remedy for unfair labor practice).

5. (b) It shall be an unfair labor practice for a labor organization or its agents—

\*  \*  \*  \*  \*  \*

(3) to refuse to bargain collectively with an employer. . . .

6. As a result of the *Scofield* mandate, the Board explained, it found that the union in *Carpenter Local Union No. 22*, 195 NLRB 1 (1975), had restrained and coerced a member in retaliation for his complaining about the conduct of an intraunion election in violation of his right to participate freely in internal union affairs guaranteed by the LMRA.

(1976), from its decision in the present case. In *Boyle* the employer had refused to appoint a trustee to administer a trust fund, even though he had agreed to the collective bargaining agreement that provided for the trust fund. The Board did not adopt the ALJ's finding that the employer had refused to bargain in good faith or his recommendation that the employer be compelled to comply with the trust provisions. Instead, because the proposed trust fund violated § 302(c)(5)(C) by mixing pension benefits with other fringe benefits, the Board held that the employer had not refused to bargain in good faith. In the present case the Board explained that it had merely used § 302 as an aid in *Boyle* to determine whether the employer had refused to bargain collectively in violation of § 8(a)(5). However, in *Central Florida*, the Board had the view that it would first have to determine the validity of the trust fund under § 302 and then predicate an unfair labor practice finding upon any such violations.

The Board acknowledged its obligation to accommodate other statutory policies in administering the NLRA. It discerned an intent by Congress to compel compliance of trust funds with the requirements of § 302 without depriving the employees of their benefits. This intent the Board said could only be achieved by the district courts, which have the equitable powers to correct technical defects in a fund without disturbing employer contributions and employee benefits. By contrast, the Board only has the power to jettison the whole trust fund from the collective bargaining agreement. Therefore, the Board concluded, it would not extend its jurisdiction to determine the validity of the trust fund under § 302.

The Board also decided the association's other claims, which the ALJ had found un-

necessary to address.[7] The Board found that the employer-appointed trustee of the trust fund was not a collective bargaining agent of the employer within the meaning of § 9 of the NLRA, 29 U.S.C. § 159, and that the trustee's sole responsibility is to the employees as a fiduciary. Thus, although the association had been denied the choice of a trustee, who had been appointed by the first participating employers association, by striking for the trust fund the union local had not coerced the members of the association in violation of § 8(b)(1)(B).

Second, the Board held that the general counsel had not sustained the burden of proving that the trust fund authorizes strike benefits. The Board reviewed the trust documents and found no mention of strike benefits and no evidence that the trustees interpreted the trust agreement to authorize such benefits.

Finally, the Board held that the trustee designation clause was a mandatory subject of bargaining. The Board noted that the payments from the trust fund were clearly wages within the meaning of § 8(d),[8] and concluded that the trustee designation scheme was "inextricably interwoven and subservient" to the trust fund as a whole because multi-employer, industrywide trust funds, which cannot add a trustee for every employer who participates, afford greater financial benefits to the employees.

The association raises the following as error:

1. The Board erred in deciding it lacked jurisdiction to rule upon the validity of the trust fund under § 302. To the contrary, the Board has the statutory authority and obligation to assess the legality of a trust under § 302(c)(5) in determining whether

---

**7.** The association raised three other claims: (1) the trust fund, which denied the association the right to select its own trustee, coerced the association in its selection of a collective bargaining representative in violation of § 8(b)(1)(B); (2) the trust fund is a nonmandatory subject of bargaining over which the union cannot strike because it permits payment of strike benefits; and (3) the trustee designation clause is a nonmandatory subject of bargaining because it

pertains solely to the relationship between a party and its representative.

**8.** "For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment. . . ."

the fund is an illegal subject of collective bargaining.

2. The Board erroneously concluded that trustees are not collective bargaining agents of the parties who appointed them.

3. In holding that the trust fund did not authorize strike benefits, which would render it a nonmandatory subject of bargaining, the Board ignored the evidence and contrary federal law under § 302(c)(5)(A).

4. The Board erred in finding the trustee designation clause a mandatory subject of bargaining. Even though the benefits payments from the fund are a mandatory subject of bargaining the trustee selection mechanism is an independent clause that does not relate directly to the employer/employee relationship.

We affirm the Board's decision.

I. Jurisdiction of the Board to determine validity of a § 302 trust.

■ We are reviewing the Board's decision that the union did not commit an unfair labor practice under § 8(b)(3) by bargaining to impasse for a trust fund alleged by the association to violate § 302 of the LMRA. This issue presents problems of the interplay between the NLRA, which the Board administers, and the LRMA, which the district courts enforce. The issue can be divided as follows: Did the Board interpret § 8(b)(3) correctly and did it properly accommodate § 302 in its interpretation? When presented with a question of statutory construction of the NLRA this court defers to the interpretation given the statute by the Board as the agency charged with its enforcement if that interpretation is reasonable and consistent with prior holdings, *Bayside Enterprises, Inc. v. NLRB*, 429 U.S. 298, 304, 97 S.Ct. 576, 581, 50 L.Ed.2d 494 (1977); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

Sections 8(a) and (b) respectively define employer and union unfair labor practices. In addition to prohibiting specific acts § 8 also incorporates the rights and requirements of §§ 7 and 9·of the NLRA, 29 U.S.C. §§ 157 and 159.[9] Section 8(b)(3) makes it an unfair labor practice for a union to refuse to bargain collectively with an employer representative who has a concomitant duty to bargain under § 8(a)(5). Section 8(d) defines collective bargaining as meeting and conferring in good faith with respect to "wages, hours and other terms and conditions of employment," the so-called mandatory subjects of bargaining.

The Board has consistently held that a violation of § 302 of the LMRA is not ipso facto an unfair labor practice. *Cheney California Lumber Co.*, 130 NLRB 235, 240 (1961), *affirmed*, 319 F.2d 375 (9th Cir. 1963); *Baggett Industrial Contractors*, 219 NLRB 171, 172 (1975). This is a reasonable interpretation of § 8, and the association does not challenge it. That section contains the exclusive acts that constitute an unfair labor practice while a violation of § 302 is a criminal act, a misdemeanor, § 302(b).

The association contends, however, that the union's insistence on the inclusion of an illegal contract provision, in this case the trust fund, within the collective bargaining agreement amounts to a refusal to bargain in good faith. In this manner, the association argues, the Board would be enforcing the NLRA and not § 302.

■ The proposition that striking for an illegal contract provision is a refusal to bargain in good faith is not beyond dispute. It has generally been applied in cases where the illegal contract provision violates another part of § 8.[10] The right of an employer

9. For example, neither employers nor unions may interfere with an employee's exercise of rights guaranteed in § 7, see §§ 8(a)(1) and 8(b)(1)(A). A union may not force an employer to bargain with one union when another union has been certified under the provisions of § 9, see § 8(b)(4)(C).

10. *See Associated General Contractors v. NLRB*, 465 F.2d 327, 334 (7th Cir. 1972), *cert. denied*, 409 U.S. 1108, 93 S.Ct. 907, 34 L.Ed.2d 689 (1973) (bargaining to impasse for an arbitration clause that coerced employer in selection of collective bargaining representative); *NLRB v. Amalgamated Lithographers*, 309 F.2d 31 (9th Cir. 1962), *cert. denied*, 372 U.S. 943, 83 S.Ct. 936, 9 L.Ed.2d 968 (1963) (violation of the

to be free from economic coercion by the union to implement an illegal contract term is at least within the realm of protection afforded in § 8. However, if the Board were to extend such protection whenever a contract provision is alleged to violate any statute, two problems might arise. First, the Board would be interpreting and, in effect enforcing, statutes in areas outside of its expertise.[11] Second, the Board's limited method of enforcement might conflict with another statute's enforcement scheme.

The Board's decision in the present case that it has no jurisdiction to determine the validity of a § 302 trust fund is not entirely consistent with its past decisions addressing allegations of § 302 violations. In *Cheney California Lumber Co.*, *supra*, a union struck to compel the employer to agree to a health and welfare trust proposal contended by the employer to violate § 302. The Board did not adopt the trial examiner's finding that the proposal did not provide the safeguards required by § 302 because the evidence showed that the union was striving for a legal trust and further negotiations on the trust were contemplated. The Board observed that it did not have direct responsibility for enforcing § 302 and stated that, in the absence of a determination of the trust proposal's illegality by the agency charged with enforcing § 302, it was "not prepared to say that [the union's] insistence thereon constituted a refusal to bargain in good faith." 130 NLRB at 241–42. In *John F. Boyle Co.*, 222 NLRB 1309 (1976), the Board rejected the ALJ's finding that the employer had refused to bargain in good faith when it would not appoint a

trustee to administer the trust proposed in the collective bargaining agreement it had signed. The Board pointed out that the trust proposal, which contemplated one fund for both pension and welfare benefits, violated § 302 on its face.[12] Therefore, the Board concluded, it would not order employer compliance with the collective bargaining agreement that would result in establishing a clearly illegal trust fund.

By speaking in terms of jurisdiction the Board throws its past decisions into doubt. Jurisdiction is either present or absent. Lack of jurisdiction is inconsistent with *John F. Boyle Co.*, where the Board examined the trust fund documents to determine if the proposed trust comported with § 302 requirements. The problem is properly addressed in terms other than jurisdiction. We instead focus on the Board's authority to define a refusal to bargain as including union insistence upon a contract provision that may violate a statute other than the NLRA. The Board might have adopted two extreme positions: premising a refusal-to-bargain charge upon union insistence on a contract term that violates any statute, or restricting a refusal-to-bargain charge solely to union insistence upon a contract term that violates the NLRA. It appears to us that the Board has chosen a compromise between the two extremes—that a union may bargain to impasse over a trust fund that may violate § 302 unless a court has already determined the fund's illegality or the illegality is evident on the face of the documents.

In this case the Board stressed that the alleged violation of § 302 hinged upon an

---

hot cargo provision of § 8(e)); *In Re Maritime Union*, 78 NLRB 971, *enforced*, 175 F.2d 686 (2d Cir. 1949), *cert. denied*, 338 U.S. 954, 70 S.Ct. 492, 94 L.Ed. 589 (1950) (violation of § 8(b)(2)); *International Typographical Union, Local 38 v. NLRB*, 278 F.2d 6 (1st Cir. 1960), *rev'd in part and aff'd in part*, 365 U.S. 705, 81 S.Ct. 855, 6 L.Ed.2d 36 (1961) (violation of §§ 8(b)(2) and 9(a)); *but see Brennan v. Emerald Renovators, Inc.*, 410 F.Supp. 1057, 1061 (S.D.N.Y.1975) (bargaining to impasse for wage provisions that violate the Equal Pay Act would be an unfair labor practice, relying upon the cases cited above).

**11.** In *NLRB v. Amax Coal Co.*, 453 U.S. 322, 337, n. 21, 101 S.Ct. 2789, 2798 n. 21, 69 L.Ed.2d 672, 685 n. 21, the Court noted that if the administration of trust funds were considered "collective bargaining" within the meaning of § 8(d), the Board would have to review the actions of the trustees to determine if they were bargaining in good faith under § 8(a)(5). This, said the Court, would force the Board to regulate areas not committed to it by Congress.

**12.** Section 302(c)(5)(C) requires pension benefits to be kept in a separate trust.

in-depth analysis of a complex multi-employer trust fund. At the time of the Board's decision there had been no finding of a trust fund's illegality by a district court, except for findings of fact made pursuant to the issuing of a preliminary injunction in *Mobile Mechanical Contractors Association, Inc. v. Carlough*, 382 F.Supp. 1134 (S.D.Ala.1974). These findings, the Board held, were provisional and had no collateral estoppel effect in other judicial proceedings. Record 489 n. 10.

■ Several factors make the Board's decision reasonable and consistent with past decisions. *Bayside Enterprises, Inc. v. NLRB, supra*. First, because management and union are equally represented the trustee selection process does not clearly or obviously violate § 302(c)(5)(B). The disparate means of replacing trustees permit employers to contribute without sacrificing stability of administration. If this structure is invalid the invalidity is not readily discernible on the face of the documents. Second, the trust fund is a multi-employer fund that was already functioning and to which the association members were contributing when the complaint was brought. Given the difficulty of the question involved, the Board was understandably reluctant to declare this large trust fund illegal, interfere with the bargaining process, and deprive employees of their benefits based upon its own interpretation of a law in which it has no special expertise.

Our finding that the Board's interpretation of § 8(b)(3) was reasonable does not end the inquiry. The Supreme Court has cautioned the Board to accommodate its administration of the NLRA to other statutory schemes in light of the entire scope of Congressional purpose in labor law. *Southern Steamship Co. v. NLRB*, 316 U.S. 31, 62 S.Ct. 886, 86 L:Ed.2d 1246 (1942) (Board's reinstatement of striking seamen unlawfully discharged ignored Congressional mandate to punish seamen who disobey their employer for mutiny). The association argues that by refusing to determine the validity of the trust fund under § 302 the Board undermined the purpose of that section because its non-action would permit the union to coerce the employer to make illegal payments to union representatives.

■ The Board's decision does not frustrate either the purpose or enforcement scheme of § 302. Courts have recognized Congress' intent with respect to existing trust funds to ensure the continued flow of benefits to the trust beneficiaries despite structural flaws in the trust. *National Stabilization Agreement of the Sheet Metal Industry Trust Fund v. Commercial Roofing & Sheet Metal*, 655 F.2d 1218 (D.C. 1981), *pet. for rehearing denied*, June 17, 1981 (unpublished) (employer cannot raise the invalidity of the trustee selection process as a defense to a collections action brought in district court for refusing to contribute to the same trust fund in the present case; employer may still bring an action in district court to cure structural defects). As the Board observed, its cease and desist powers to remedy an unfair labor practice cannot cure defects in the trust fund but can only enjoin payments and further demands for the fund. In comparison, a district court can enforce compliance with § 302 by eliminating the invalid provisions of the trust. *Associated Contractors of Essex County, Inc. v. Laborers Int'l Union*, 559 F.2d 222, 225 (3d Cir. 1977).[13]

Nothing in the Board's ruling before us prevents or discourages the association from seeking relief in the district court. The Board simply refused to relieve the

---

**13.** The Board's decision in *John F. Boyle Co., supra*, which did not compel an employer to establish a trust fund that clearly did not comport with § 302, also accommodated § 302. Congress did not intend to force employers to contribute to trust funds not yet established. *Bricklayers, Masons and Plasterers Int'l Union v. Stuart Plastering Co.*, 512 F.2d 1017 (5th Cir. 1975); *NLRB v. St. Louis Cordage Mills*, 424 F.2d 976 (8th Cir. 1970). Where a trust fund has not been established there is no interest in continued benefits, although in *St. Louis Cordage Mills*, the court ordered the Board to fashion a remedy requiring the employer to pay the amount due into a fund not administered by the decertified union to ensure the employees would derive benefits. 424 F.2d at 981.

members of the association from their obligation to contribute to the trust fund or to impose cease and desist sanctions against the local for demanding the trust fund.[14]

Where the Board has predicated in part an unfair labor practice upon a violation of another statute the Board found that the other statute's policies would be frustrated if, for example, an employer action has the effect of discouraging access to another agency to file complaints, see, e. g., Alleluia Cushion Co., 221 NLRB 999 (1975) (discharge of employee for complaining to the Occupational Safety and Health Administration is a restraint on concerted activity even though the employee had not acted with other employees because the purpose of OSHA is to benefit all employees). A union fine against a member for complaining about an intraunion election procedure frustrated the policy of the LMRA that permits employees to participate freely in internal union affairs, Carpenters Local Union No. 22, 195 NLRB 1 (1972).

We defer to the Board's interpretation of § 8(b)(3) that the strike by the union for the trust fund was not a refusal to bargain in good faith. The Board's application of the statute is reasonable and consistent with past decisions. NLRB v. Pipefitters, 429 U.S. 507, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977).

## II. Trustees as collective bargaining agents

■ NLRB v. Amax Coal Co., 453 U.S. 322, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981), disposes of the association's argument that by striking for the trust the union coerced the employer's choice of a collective bargaining agent. In Amax, an employer who ran deep-shaft coal mines participated in a national multi-employer trust fund, the employer-appointed trustee of which had been selected by a coal operators association to which the employer belonged. The employ-

er subsequently opened a surface mine with respect to which its membership in the association did not apply. The employer refused to contribute to the trust fund on behalf of the surface mine employees and the union struck. The operators association had already been chosen by the management trustee. The employer charged the union with an unfair labor practice, contending that the union was coercing it in its selection of a collective bargaining agent in violation of § 8(b)(1)(B). The Court unequivocally rejected this argument by holding that a trustee acts solely as a fiduciary and cannot administer the trust fund in the interest of the party who appointed him. 453 U.S. at 330–31, 101 S.Ct. 2794–95, 69 L.Ed.2d at 680–81. Bargaining to impasse to compel the employer to join the trust fund where the employer cannot choose the management trustee was not an unfair labor practice.

The association contends that Amax is not controlling because the Court's holding that an employer-appointed trustee is not a collective bargaining agent is premised on a valid trustee selection process. The association brings forward several reasons which it says demonstrate that the trustee selection process in the present case is not valid. First, in Amax, although the individual employer could not appoint the trustee, the operators association to which it belonged had the opportunity to choose the trustee, while in this case the association had no voice in selecting a trustee because the first participating employers association already had chosen the sole management trustee. Second, the international president, Carlough, had helped select the sole management trustee.[15] Finally, Carlough himself serves as the union-appointed trustee and, the association says, cannot divorce his union responsibilities from his fiduciary obligations when administering the trust fund.

14. Whether the district courts can enjoin a strike for a trust fund that violates § 302 has never been properly brought to this court. See Mobile Mechanical Contractors Ass'n v. Carlough, 566 F.2d 1213 (5th Cir. 1977) (issue moot).

15. The district court so held in the companion case, Mobile Mechanical Contractors Association, Inc. v. Carlough, 456 F.Supp. 310 (S.D. Ala.1978), affirmed on other grounds, —— F.2d —— (5th Cir. 1981). We accept this finding as correct for purposes of the present case.

■ We hold that these asserted differences do not cause the trustees of the trust fund in this case to function as collective bargaining agents. A trust fund could not operate if each late-joining employer or association of employers could upset an earlier choice of a management trustee on the ground it had no opportunity to participate in the selection. Although Carlough was appointed by the union, he is required to administer the trust as a fiduciary and in the sole interest of the employees. With respect to union participation, through Carlough, in the selection of the management trustee, even if the participation is to a degree prohibited by § 302, the trustee must still serve as a fiduciary with his sole obligation running to the employees. As we pointed out in Part I, the proper remedy for alleged unequal representation in the selection mechanism is for the association to bring an action in district court. The asserted defects that are said to distinguish this case from *Amax* do not diminish the duty of trustees, whether management-appointed or union-appointed, to serve as fiduciaries nor do the defects permit the trustees to act as collective bargaining agents. One violation of § 302 cannot justify another.

### III. Strike benefits as a nonmandatory subject of bargaining

■ The trust fund pays benefits to "involuntarily underemployed" workers. The association argued that striking union members could receive benefits for being involuntarily underemployed. A union cannot bargain to impasse for strike benefits because they do not come within the scope of wages or other mandatory subjects of bargaining listed in § 8(d), *Operating Engineer, Local 12*, 187 NLRB 430, 432 (1970). Payment of strike benefits from an employer-funded trust violates § 302, which lists the type of permissible payments. *See Carpenters v. Delaware Contractors Ass'n*, 344 F.Supp. 1281, 1285 (D.Del.1972), *aff'd*, 477 F.2d 564 (3d Cir. 1973) (Congress impliedly prohibited payments to union representatives not specifically excepted).

After reviewing the trust fund documents and other evidence presented to the ALJ the Board found that the documents did not explicitly provide for strike benefits and the trustees had not so interpreted them. The possibility that trust payments could be made to strikers under the guise of involuntary underemployment did not transform the trust fund into a nonmandatory subject of bargaining. Thus the general counsel had not met his burden of proving an unfair labor practice.

The association also contends that the Board erroneously placed the burden of proof on the general counsel instead of the union, which has the burden of establishing a trust's strict conformity with § 302 requirements. Further, the association asserts that the Board ignored Congressional intent to eradicate even the possibility that an employer would contribute to "union war chests." *See, e. g., United Marine Division v. Essex Transportation Co.*, 216 F.2d 410, 412 (3d Cir. 1954).

■ Consistent with our findings in Part I, absent a prior court determination or explicit violation it is reasonable for the Board to refuse to premise an unfair labor practice on the fact that the payment structure might violate § 302. This holding does not end the inquiry because the Board must still determine whether the trust fund contemplates strike benefits, rendering it a nonmandatory subject of bargaining under § 8(d). It is appropriate for the Board to look to § 302 as an interpretive aid for detecting whether strike benefits are contemplated just as it looked to § 302 to determine if the trustees could be considered collective bargaining agents as that term is used in § 8(b)(1)(B). But the Board need not apply § 302 evidentiary standards (which determine when a trust fund is invalid for not safeguarding against the payment of strike benefits) to § 8 proceedings to determine if the union is bargaining for strike benefits, particularly when those standards conflict with established § 8 evidentiary standards. The possibility that a fund may be used to provide surreptitious strike benefits is sufficient for a court to

find the fund violates § 302, *Carpenters v. Delaware Contractors Ass'n, supra,* but it is not a sufficient basis upon which to premise an unfair labor practice. Section 8 places the burden of establishing an unfair labor practice on the general counsel who must prove an actual, not a potential violation. *Chevron Oil Co. v. NLRB,* 442 F.2d 1067, 1069 (5th Cir. 1971).

■ Under this standard we find adequate support in the record for the Board's decision. The only tangible evidence that strike benefits were contemplated comes from a representative of the international who told an association member that funds would be disbursed during a strike only if the strike occurred during the two annual disbursement periods.[16] Before making this statement the representative assured the member that payment would be made in strictest compliance with federal law.[17] The Board's conclusion that this evidence did not establish an unfair labor practice was reasonable.

### IV. Trustee selection process as a mandatory subject of bargaining

Only contract provisions that pertain to the employer-employee relationship are considered mandatory subjects of bargaining over which a union may strike. *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 178, 92 S.Ct. 383, 397, 30 L.Ed.2d 341 (1971). The association contends that the employer's selection of a trustee does not affect the benefits paid out, or any other term or condition of employment, and cannot be considered a mandatory subject of bargaining.

■ The Board's judgment as to what constitutes a mandatory subject of bargaining is entitled to considerable deference, *Ford Motor Co. v. NLRB,* 441 U.S. 488, 495, 99 S.Ct. 1842, 1848, 60 L.Ed.2d 420 (1979), and we find its reasoning persuasive. A multi-employer trust fund can provide greater benefits from a larger pool of mon-

ey. But the size of the fund may present problems of administration. To provide an efficient yet stable administration the trustee selection process must be carefully structured. If all employers could select and remove trustees the trust fund could not function. Thus the record supports the finding by the Board that a sufficient nexus existed between the trustee selection mechanism and the benefits. The Board's decision is consistent with its earlier decisions in *United Slate, etc., Local No. 220,* 177 NLRB 632 (1969) (union's demand that an employers association participate in a regional trust fund in which the association could select only two of the six employer trustees is a mandatory subject of bargaining); *Carpenters, Local 964,* 181 NLRB 948 (1970), *enforced,* 447 F.2d 643 (2d Cir. 1971) (union demand that employer trustees of a welfare fund be selected from an explicit class of employers was beyond mandatory scope of bargaining where the union had not articulated any connection between the trustee selection and benefits).

The Board's interpretation of § 8(d) does not conflict with or fail to accommodate § 302 by permitting the union to participate in the selection of the employer-appointed trustee. In *Amax,* 453 U.S. at 341–42, 101 S.Ct. at 2800–01, 69 L.Ed.2d at 688, the Supreme Court declined to hold that § 8(b)(1)(B) limits the freedom of a union to try to induce an employer to select a particular trustee, because the NLRA and the LMRA have different purposes and standards to enforce. The Court also noted that to prevent the union from striking to obtain an employer's participation in a multi-employer trust fund when the employer objects to the trustee selection mechanism would hinder Congressional policy in favor of multi-employer trust funds. *Id.* 453 U.S. at 338 n. 22, 101 S.Ct. at 2799 n. 22, 69 L.Ed.2d at 686 n. 22. If the selection process violates § 302 the association can seek relief in a district court.

---

**16.** Record 283. The member testified that the "Administrator of the trust fund" from Washington, D.C., whose name he could not remember, was also present at this meeting.

**17.** Record 283.

In summary, we affirm the Board's decision that the strike to obtain the trust fund was not a refusal to bargain in good faith despite alleged structural defects in the trust; that the union did not attempt to coerce the employer's choice of a collective bargaining representative; that the union did not strike over strike benefits that are a nonmandatory subject of bargaining; and that the trustee designation clause was a mandatory subject of bargaining.

The order of the Board is AFFIRMED.