BAKER MANUFACTURING COMPANY, Petitioner-Cross Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.

No. 84–4522

Summary Calendar.

United States Court of Appeals, Fifth Circuit.

May 9, 1985.

Sewell & Riggs, Daniel O. Goforth, N. Carlene Rhodes, Houston, Tex., for petitioner-cross respondent.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., for respondent-cross petitioner.

Louis V. Baldovin, Jr., Regional Director, Bob Casey, Houston, Tex., for other interested parties.

Before CLARK, Chief Judge, GARWOOD, and HIGGINBOTHAM, Circuit Judges.

CLARK, Chief Judge:[1]

Baker Manufacturing Company (the Company) petitions this court to set aside an order of the National Labor Relations Board compelling remedial measures for unfair labor practices allegedly committed by the Company in violation of section 8(a)(1) and (3) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(1) and (3). The Board cross-petitions for enforcement of its order. We remand in part and enforce in part.

## I

The Company, a wholly owned subsidiary of Baker Marine Corp., machines and assembles components for oil rigs used on offshore drilling platforms. The majority of its work comes from Baker Marine. According to the administrative law judge (ALJ), Temple Williams, general manager of the Company, normally reported to several officers of Baker Marine, including President Larry Baker, Jr. and Executive Vice President John Haley.

In 1981 Baker Marine's employees were members of the United Steelworkers of America, while the Company's workers were not organized. On January 30 of that year Baker Marine engaged in a lockout of its union employees. Six first-shift machining department employees of the Company met with a representative of the International Union of Electrical Workers (IUE) on February 11, 1981, to discuss organizing the Company. The employees were Tim Jolly, Connie Lane, Gary Thornton, Jesus Canales, Herman Arrendondo, and Roger Strackbein. On the following evening, Jolly, Lane, and Arrendondo went to the home of Williams's secretary, Debra Karsteed, to ask her for a list of all the company employees. They told her that they were planning an organizational effort at the Company and named nine other employees who were involved—Thornton, Canales, Kenneth Appleton, Roger Strahm, Gene Wright, Jr., Edward Brown, Clay Kuykendall, Pat Rhea, and Mike Lewey. All of these individuals worked on the Company's first shift.

According to Karsteed's later testimony she was angered by the fact that the employees were taking such action at a time when Williams was hospitalized and so she refused to cooperate. Because she was concerned about upsetting Williams while he was ill, Karsteed arranged a meeting with Haley on Friday, February 13. She described the meeting of the previous evening and gave the names of the employees listed above, which Haley wrote down. Based on the testimony of machinist Roger Strahm, the ALJ found that Haley had called Williams at the hospital and conveyed the information he had acquired from Karsteed. Williams was released from the hospital that same day.

On the following Monday, February 16, Williams called all the first shift machine shop employees into his office for a meeting to discuss problems at work. The employees testified that Williams was angry and upset at this meeting. He told them that he had heard rumors that they were unhappy with the way they were treated. He stated that he was authorized by the Bakers to run the Company as he saw fit and that if any employee did not like it, the door was big enough for all of them to go through.

Two days later Lane was informed that she was being terminated because the Company had decided to eliminate her position as toolroom attendant. Jolly was terminated the next day, allegedly because he had come to work intoxicated the previous Friday. On February 25, at the suggestion of the IUE organizer, the remaining pro-union employees began to wear badges with the legend YES UNION to protect themselves.

---

1. All but one of the issues raised on appeal do not have precedential value. Local Rule 47.5 provides: "The publication of opinions that have no precedential value and merely decide particular cases on the basis of well-settled principles of law imposes needless expense on the public and burdens on the legal profession." Pursuant to that Rule, the Court has determined that non-precedential portions of this opinion should not be published. The omitted parts of the unpublished opinion are indicated by a footnote reference.

According to the ALJ, the badges were worn by about twelve employees, the same individuals whose names had been given to Haley by Karsteed. The next day a photographer came into the shop and spent 30 to 45 minutes taking pictures of the employees as they worked.

Canales was terminated two days later. Like Lane, he was told that his position, maintenance electrician, was being abolished. Three other employees whose names were given to Haley—Appleton, Wright, and Brown—were laid off on March 6. On March 12, Williams engaged Thornton in conversation and informed him that if he repented his sins, he would be forgiven. Thornton did not respond. He was laid off the next day, along with Strahm. All five employees laid off in March were identified pro-unionists who had worn the badges and attended the meetings.

The ALJ concluded that the terminations and layoffs, the taking of photographs, and Williams's statement to Thornton all constituted unfair labor practices in violation of section 8(a)(1) and (3) of the Act, 29 U.S.C. § 158(a)(1) and (3). In material part he recommended that the Company be ordered to cease all illegal interference with protected employee organizational efforts and to take the following affirmative remedial action: Appleton, Jolly, Strahm, and Wright must be offered reinstatement to their former jobs, or if those jobs no longer exist, to substantially similar positions. Lane and Canales must be offered reinstatement to their former positions and, should either accept, the abolished position must be reestablished. All former employees must be reimbursed, with interest, for lost earnings and Canales must also be reimbursed for any of his expenses incurred in taking work-related courses, to the extent that the Company would have paid for such courses as to be determined in the compliance stage of these proceedings. All references to Jolly's discharge must be expunged from his personnel record and he must be notified in writing

that this evidence will not be used against him in any future personnel action. Finally, the ALJ issued a notice explaining his findings and the remedial action and ordered the Company to post copies in prominent places. Brown and Thornton were excluded from the reinstatement order, but not the portion compelling backpay, because the ALJ determined that Brown had already been reinstated and that Thornton had declined a valid reinstatement offer.

His recommended decision and order were reviewed by a three-member panel of the Board. Both parties filed exceptions to his recommendations. The panel affirmed the conclusions of the ALJ but, partly in response to the exceptions, modified the order in the following ways: (1) the expunction remedy was expanded to include all of the employees who were laid off or terminated; and (2) the question of whether Thornton, Appleton, and Wright had received and declined offers of reinstatement was remanded for decision in the compliance stage. Finally, the notice to be posted was altered to reflect these changes.

## II

On appeal the Company asserts that (1) the Board's findings regarding the unfair labor practices were erroneous; (2) it had issued valid offers of reinstatement to Appleton, Wright, and Thornton who chose to reject the offers; and (3) the Board is not empowered to order the reestablishment of the abolished positions formerly held by Canales and Lane. All of these objections were first raised before the Board as required by NLRA § 10, 29 U.S.C. § 160.

## III

 Section 7 of the Act, 29 U.S.C. § 157, gave employees the right to organize or join labor organizations. Section 8(a), 29 U.S.C. § 158(a), prohibits employer interference with the exercise of that right and discrimination in hire or tenure to encourage or discourage union activity.[2]

---

**2.** NLRA § 8(a)(1) and (3), 29 U.S.C. § 158(a)(1) and (3) provide in relevant part:

Congress has charged the Board with the primary responsibility for enforcing the Act. *N.L.R.B. v. Brookwood Furniture,* 701 F.2d 452, 456 (5th Cir.1983). The Courts of Appeals may review the Board's factual findings only to ensure that those findings are "supported by substantial evidence on the record considered as a whole." NLRA § 10(f), 29 U.S.C. § 160(f); *Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). We may not substitute our interpretation of the facts for that of the Board. *N.L.R.B. v. Enterprise Association of Pipefitters,* 429 U.S. 507, 97 S.Ct. 891, 905, 51 L.Ed.2d 1 (1977). The Board's conclusions are entitled to special deference where a credibility choice is involved. *N.L.R.B. v. Southern Plasma Corp.,* 626 F.2d 1287, 1293 (5th Cir.1980). Even on questions of statutory construction of the Act we must defer to the Board's interpretation if it is reasonable and consistent with prior holdings. *Central Florida Sheet Metal v. N.L.R.B.,* 664 F.2d 489, 496 (5th Cir.1981). *See N.L.R.B. v. Transportation Management Corp.,* 462 U.S. 393, 103 S.Ct. 2469, 2475, 76 L.Ed.2d 667 (1983).

### A. Unfair Labor Practices

The Board found that the Company committed three types of unfair labor practices: (1) conducting illegal surveillance of its employees' union activities; (2) threatening an employee to stop his union activity; and (3) terminating or laying-off the employees discussed above because of their union activities. These conclusions represent factual determinations. Therefore, we will analyze each one under the substantial evidence standard. Each finding is affirmed.[3]

\*　　\*　　\*　　\*　　\*　　\*

### B. The Remedy

■ Section 10(c) of the Act gives the Board wide discretion in devising remedial measures in response to violations of the Act. 29 U.S.C. § 160(c). Judicial review is limited to ensuring that the Board's orders effectuate the policies of the Act and that the remedy is tailored to the nature of the unfair labor practice it is designed to address. *Sure-Tan, Inc. v. N.L.R.B.,* —— U.S. ——, 104 S.Ct. 2803, 2812–13, 81 L.Ed.2d 732 (1984).

■ The Board's decision to leave the question of the reinstatement offers made to Appleton, Wright, and Thornton to the compliance phase of this proceeding was within its discretion. At that time the Company will be afforded a full opportunity to present its arguments to the Board and, if necessary, to seek review by this court. The Supreme Court has long recognized the validity of the Board's reliance on subsequent compliance proceedings to adjust a general order of reinstatement and back pay to fit the individual circumstances of each illegal discharge. *Id.,* 104 S.Ct. at 2814.

For the most part, the cease and desist order and the affirmative actions ordered by the Board represent standard remedies for the types of unfair labor practices found here. They will be enforced without further analysis. A question remains, however, as to whether the Board exceeded its discretion by compelling the reestablishment of the discontinued positions formerly held by Lane and Canales rather than providing some other remedy or permitting the Company to offer them substantially similar positions.

■ The basic purpose of a reinstatement order is to restore the economic status quo that would have existed but for the employer's illegal activities. *Golden State Bottling Co. v. N.L.R.B.,* 414 U.S. 168, 94 S.Ct. 414, 427, 38 L.Ed.2d 388 (1973). However, it is not intended to lock the employer

---

(a) It shall be an unfair labor practice for an employer—
　(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

\*　　\*　　\*　　\*　　\*　　\*

　(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .

**3.** Portions of unpublished opinion omitted.

into maintaining that status quo without due consideration of economic realities at the time the remedy is effectuated. In the present case the Company has alleged that these positions are not economically justifiable. The record supports the conclusion that these jobs were abolished as part of the Company's scheme to eliminate the union activists. There is no substantial evidence that Williams ever seriously considered the economic factors affecting these jobs prior to terminating Lane and Canales. However, it might well be true that these positions are superfluous today. If so, the Company should not be compelled to re-create and maintain unnecessary positions for an indeterminate period if less extreme and equally effective remedies are available. *See N.L.R.B. v. Fort Vancouver Plywood Co.*, 604 F.2d 596, 601–03 (9th Cir.1979), *cert. denied*, 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980); *Florsheim Shoe Store Co. v. N.L.R.B.*, 565 F.2d 1240, 1246–47 (2d Cir.1977). Violation of the Act does not make an employer an outlaw. *N.L.R.B. v. American Manufacturing Co.*, 351 F.2d 74, 80 (5th Cir.1965). It retains the right to make legitimate decisions regarding the most efficient means of running its business. *See Florsheim Shoe Store Co. v. N.L.R.B.*, 565 F.2d at 1247.

We do not hold that the Board lacks the authority to impose this remedy, but merely that the record before us does not support the conclusion that the coerced re-creation and maintenance of these two positions has been shown to be necessary to effectuate the policies of the Act. *N.L.R.B. v. American Manufacturing Co.*, 351 F.2d at 81. Before restoration of these positions can be mandated, the Company must be afforded an opportunity to demonstrate that the re-creation and continuation of these positions at the time Lane and Canales accept reinstatement, if they choose to do so, would be economically inefficient. Not even the accepted finding that, at the time of discharge, the Company's termination of the positions was a pretext for unfair labor practices will suffice to demonstrate that these positions must now be re-created to provide an effi-

cacious remedy. Equivalent positions may be available. Conditions and justifications may be present in the Company's present affairs which were not present at the time of discharge.

### IV

We enforce the order on review in its entirety except as to provisions requiring the compulsory reestablishment of the positions of toolroom attendant and maintenance electrician for Lane and Canales.

ENFORCED IN PART AND IN PART REMANDED.